UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LORIE J. S.,  
          Plaintiff,

v.

MARTIN J. O'MALLEY, *Commissioner of Social Security Administration*,

          Defendant.

Case No. 22-CV-2658 (JFD)

**ORDER**

Plaintiff Lorie J. S. seeks judicial review of the Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB"). (Compl. ¶ 1, Dkt. No. 1.) Following a hearing, an administrative law judge ("ALJ") found Plaintiff was not disabled. The Social Security Appeals Council affirmed the ALJ, making the ALJ's decision a final agency action for purposes of judicial review under 42 U.S.C. § 405(g).

The administrative record includes three medical source statements from Plaintiff's primary care physician, Michael Gilchrist, M.D. In those medical source statements, Dr. Gilchrist gives his opinions about Plaintiff's occupational limitations and their severity. The ALJ found none of Dr. Gilchrist's opinions persuasive. Plaintiff claims that the ALJ reached this conclusion by not properly considering the "consistency" and "supportability" of Dr. Gilchrist's opinions. Plaintiff also argues that the ALJ did not properly consider the aggravating effect of Plaintiff's obesity on her bilateral knee osteoarthritis.

How Dr. Gilchrist's opinions are evaluated matters to the outcome of this case because the reason the ALJ decided Plaintiff is not disabled is that he found she could

1

perform her past employment as a pharmacy technician. Had the ALJ found Dr. Gilchrist's opinions persuasive, then the limitations Dr. Gilchrist said Plaintiff needed would have ruled out working as a pharmacy technician.

The case is now before the Court on motions for summary judgment[1] filed by Plaintiff (Dkt. No. 16) and Defendant (Dkt. No. 20). Plaintiff seeks reversal of the final decision of the Commissioner of the Social Security Administration ("SSA") denying her benefits while Defendant asks the Court to uphold the Commissioner's decision.

The Court finds that the ALJ's description of Plaintiff's residual functional capacity ("RFC") is supported by substantial evidence in the record. This is specifically true of the ALJ's conclusion that Dr. Gilchrist's opinions are unpersuasive because they are neither consistent with other medical evidence in the administrative record nor supported by Dr. Gilchrist's own findings. The Court further finds that the ALJ properly evaluated the effect of Plaintiff's obesity on her arthritic knees. The Court therefore **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Defendant's motion for summary judgment.

## I.   BACKGROUND

Plaintiff, who was born in August of 1969, worked as a certified pharmacy technician from September 2013 until April 2019, when the pharmacy for which she

---

[1] On December 1, 2022, the District of Minnesota amended Local Rule 7.2, which governs procedures in social security cases, to conform to the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). D. Minn. LR 7.2 advisory committee's note to 2022 amendment. The Supplemental Rules apply to actions filed on or after December 1, 2022. *Id.* Because Plaintiff filed this case on October 21, 2022—before December 1, 2022—the procedures established by the previous version of Local Rule 7.2 apply, including a provision that the Court resolve the case on cross-motions for summary judgment. *See* D. Minn. LR 7.2(c) (2015).

worked was purchased and the new owner did not hire Plaintiff. (Soc. Sec. Admin. R. (hereinafter "R.") 48.)[2] On July 9, 2020, Plaintiff filed a claim for a period of disability and DIB. (R. 209.) Plaintiff asserts she is disabled because of osteoarthritis in both knees, depression, and hypertension. (Pl.'s Mem. at 1, Dkt. No. 17.) Plaintiff claimed her disability began on April 12, 2019, the same month in which she lost her pharmacy technician job. (R. 48, 209.) Notwithstanding her claim that she was disabled from April of 2019 onwards, Plaintiff worked in a daycare center from September 4, 2019 until January 31, 2020, but has not worked since February 1, 2020. (R. 272.)

Plaintiff's application was denied at both the initial and reconsideration levels, after which Plaintiff asked for a hearing before an ALJ. That hearing was held on July 8, 2021, by telephone because of the COVID-19 pandemic. (R. 18.) In a September 1, 2021 order, the ALJ found Plaintiff was not disabled within the meaning of the Social Security Act. (R. 33.) Plaintiff's last insured date is December 31, 2024, meaning she must show she is disabled on or before that date. (R. 18.)

### A. Relevant Medical History

Plaintiff sought medical attention for her knee pain on January 30, 2020. Family medicine practitioner Jade Grimm, M.D., noted that she had a "complicated left knee history" because of reconstruction of her anterior cruciate ligament in 1986. (R. 722.) Plaintiff reported to Dr. Grimm that "over the past several months she has had

---

[2] The Court filed the administrative record at Dkt. No. 14. The Court's record is consecutively paginated, and the Court finds it more user-friendly to cite the blue ECF page numbers at the top of each page rather than the Social Security Administration's numbering system of exhibit number followed by page number within that exhibit.

3

progressively worsening left knee pain" that "hurts most when walking." (*Id.*) After examining Plaintiff, Dr. Grimm thought she most likely had osteoarthritis. (R. 723.) Dr. Grimm sent Plaintiff to a radiologist, who saw Plaintiff the same day. Images of both knees showed "advanced degenerative arthritis." (R. 721.) Dr. Grimm recommended physical therapy. Plaintiff was reluctant to have a steroid injection into her knee because in the past such injections had not been "especially helpful." (R. 723.)

The next day, January 31, 2020, Plaintiff saw a physical therapist, as recommended by Dr. Grimm. (R. 707.) She left with recommendations for exercises, as well as trials of knee sleeves and perhaps a cane. (R. 709.) Plaintiff and her physical therapist agreed on a series of objectives they would try and reach over 5 to 15 visits. (R. 710.) Plaintiff does not appear to have followed through, as the administrative record shows only one later physical therapy appointment, on February 20, 2020. (R. 698.)

After seeing Dr. Grimm, the next physicians Plaintiff saw were orthopedic surgeons, Dr. Paul Sousa and Dr. Daniel Saris,[3] on February 12, 2020, to discuss treatment options. (R. 703.) Plaintiff told the orthopedic surgeons that her knee pain had been "bothersome for multiple years." (*Id.*) On good days, she rated the severity of her pain as a four out of ten, and on bad days an eight out of ten. Dr. Sousa independently evaluated the X-rays of Plaintiff's knees that had been ordered by Dr. Grimm on January 30 and concurred with the radiologist that those images showed "severe osteoarthritis" (R. 704) and "moderate to severe end-stage degenerative changes" in her knees (R. 705). However, Dr. Sousa noted

---

[3] Dr. Sousa was an orthopedic surgery resident working under the supervision of Dr. Saris. (R. 703.)

4

that the most important complicating factor in treatment would be Plaintiff's weight. (*Id.*) Dr. Sousa said that Plaintiff would "benefit greatly from a total knee arthroplasty, but the risks are high given her BMI." (*Id.*) Plaintiff said she had tried without success to lose weight in the past, but this time was "determined to [lose the] weight in order to have total knee replacement." (*Id.*) Plaintiff was challenged in losing weight because her ability to exercise was limited because of her knee pain but simultaneously could not get the knee replacement surgery that would relieve her exercise-limiting knee pain because she could not lose enough weight to make the surgery acceptably safe. As Dr. Sousa observed, "she has worked on weight loss in the past, to no avail." (*Id.*) Dr. Sousa did not make any finding regarding any aggravating effect of Plaintiff's obesity on her osteoarthritis. His concern about Plaintiff's weight was driven by surgical risk.

Dr. Michael Gilchrist, whose opinion evidence is at issue in this case, first began treating Plaintiff in June 2018. (R. 531.) Dr. Gilchrist is board certified in family medicine, was Plaintiff's primary care physician, and saw Plaintiff every one to three months. (R. 548.) Detailed records of the 12 appointments that follow Plaintiff's loss of her daycare job[4] are in the administrative record: February 27, 2020 (R. 694); April 30, 2020 (R. 677); June 15, 2020 (R. 659); August 25, 2020 (R. 633); September 17, 2020 (R. 628); September 28, 2020 (R. 620); November 9, 2020 (R. 594): January 11, 2021 (R. 586); February 3, 2021 (R. 581); February 26, 2021 (R. 576); March 16, 2021 (R. 573); and April 16, 2021

---

[4] As noted earlier, Plaintiff claimed a disability onset date of April 12, 2019. However, because she then returned to work in a daycare center, the ALJ only considered evidence of whether Plaintiff was disabled after losing her daycare job.

(R. 565). Because the visits of September 28, 2020; January 11, 2021; February 3, 2021; and February 26, 2021 were telemedicine visits, they could not include a physical examination. All other visits were in-person.

On May 27, Plaintiff had a 40-mg corticosteroid injection into her left knee by Russ Gervais, D.O., a family medicine resident who was supervised by Jason S. O'Grady, Sr., M.D. (R. 671.) On June 15, 2020, Dr. Gilchrist performed the same procedure on Plaintiff's right knee. (R. 659–64.) At that time, Dr. Gilchrist noted that Plaintiff reported "her left knee pain has markedly improved after her intraarticular injection performed by Dr. Gervais." (R. 659.) Dr. Gilchrist also noted Plaintiff's anxiety that unless her knees improved she would not be able to find employment. (*Id.*)

During the 14 months Plaintiff was seeing Dr. Gilchrist, she also had three comprehensive orthopedic surgery workups: on February 12, 2020 with Drs. Sousa and Saris (R. 703); with Dr. Suzanne Tanner on September 30, 2020 (R. 612–19); and another visit with Dr. Tanner on November 13, 2020 (R. 612).[5] During the September visit, Dr. Tanner found that Plaintiff had moderate, rather than severe, osteoarthritis in both knees, but agreed with Drs. Saris and Sousa that "[e]ventually a total knee arthroplasty or arthroplasties are likely to be indicated." (R. 617.) Dr. Tanner also agreed with her orthopedic surgery colleagues that Plaintiff needed to lose significant weight before knee replacement surgery would be safe. (*Id.*) Dr. Tanner was more guarded than Dr. Sousa in

---

[5] Dr. Tanner also referred to a May visit with Dr. Saris (R. 612), but the undersigned found nothing in the administrative record showing Plaintiff saw Dr. Saris during that month. As noted above, Plaintiff had a steroid injection in her left knee in May, but this was done by a family medicine doctor, not an orthopedic surgeon.

her expectations of benefit from total knee replacement surgery and advised Plaintiff that "there is a chance that she may not be pleased with the results of having an artificial joint" because her osteoarthritis was moderate, not severe. (*Id.*) At the November visit, Dr. Tanner again found Plaintiff's osteoarthritis to be moderate. (R. 591.)

About a month after her first appointment with Dr. Tanner, on October 16, 2020, Plaintiff had lubricating supplements injected into both knees. (R. 606–10.) These injections were ordered by Dr. Tanner. (*Id.*)

Plaintiff was also seen for other issues not relevant to this review, including seeing a psychologist for depression and seeing an obstetrician/gynecologist for other symptoms.

### B. Dr. Gilchrist's Opinion Evidence

Dr. Gilchrist provided opinion evidence in three treating medical source statements for Plaintiff, one written on February 5, 2021 (R. 538–41); another on April 27, 2021 (R. 548–51); and the third on June 3, 2021 (R. 726–29). All three appear to be word-for-word the same except for the non-material difference that Dr. Gilchrist included a limitation on crawling in his February 5, 2021 statement that does not appear in the other two statements.

Dr. Gilchrist opined as to a number of restrictions on Plaintiff's activities, but the restrictions Plaintiff places at issue in this case are the same across all three of Dr. Gilchrist's medical source statements: Plaintiff could stand or walk for only three hours in an eight-hour workday, could sit for a total of five hours in an eight-hour workday, and required the option to sit or stand at will. (Pl.'s Mem. at 9.) As support for these limitations, Dr. Gilchrist identified "supportive X-ray findings, s/p [status post] extensive physical therapy, landmark and US [ultrasound] guided intraarticular injections, with continued

7

disruptive pain and limitations to mobility, activities of daily life and independent activities of daily life." (R. 549.) Other restrictions found by Dr. Gilchrist are not at issue in this case.

In her motion for summary judgment, Plaintiff complains that the ALJ committed reversible error by finding Dr. Gilchrist's opinions unsupported and inconsistent, because, says Plaintiff, those opinions are in fact supported by Dr. Gilchrist's own findings and consistent with the other medical evidence. Defendant, in his motion for summary judgment, argues that the ALJ properly evaluated Dr. Gilchrist's opinions, opposes Plaintiff's summary judgment motion, and asks the Court to affirm the final agency decision.

### C.    Procedural History

In evaluating Plaintiff's DIB claim, the ALJ followed the five-step process established by the Social Security Administration and described at 20 C.F.R. § 404.1520.

At step one, the ALJ determined that Plaintiff had engaged in substantial gainful activity[6] after her alleged disability onset date of April 12, 2020. (R. 20.) Plaintiff worked in a daycare from September 4, 2019 to January 31, 2020, and by doing so engaged in substantial gainful activity during the five-month waiting period after the date on which

---

[6] The Social Security Administration uses "substantial gainful activity" as a synonym for working for compensation. *See* 20 C.F.R. § 404.1572. If a claimant can engage in "substantial gainful activity" after their claimed onset of disability date, they are not disabled for SSA purposes. 20 C.F.R. § 404.1520(a)(4)(i). There are exceptions to that rule, one of which applies in this case. When a claimant works after their alleged disability onset date, then stops working again, the claimant's disability claim will be evaluated from the date of cessation of the post-initial filing job, not from the alleged disability onset date in the DIB application. Therefore, Plaintiff's disability claim in this case was evaluated as though she had claimed disability began when she lost her day care job, January 31, 2020.

she alleged her disability began. *See* 42 U.S.C. § 423(c)(2)(A). Because this period of substantial gainful activity had been followed by a 12-month period in which Plaintiff had not worked, the ALJ evaluated Plaintiff's disability as of the date she left her daycare job, January 31, 2020, rather than the date claimed as her disability onset date in Plaintiff's DIB application. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2024. (R. 20, 231.)

At step two, the ALJ found that Plaintiff had the severe impairments of bilateral knee and hip degenerative disease and obesity. (R. 21.) The ALJ noted Plaintiff's lingering fatigue following a bout of COVID-19, hypertension, back pain, mild hearing loss, and after-effects from removal of a cyst, but found all of these conditions to be not severe,[7] because none of these conditions imposed more than a minimal limitation on Plaintiff's ability to perform work-related tasks. (*Id.*) The ALJ also found that Plaintiff suffered from major depressive disorder. (R. 22.) Because Plaintiff's depression responded well to medication, the ALJ classified it as a non-severe impairment. (R. 22.)

At step three, the ALJ was called upon to determine whether any of Plaintiff's severe impairments were disabling by consulting the SSA's list of impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(d). These listed impairments are

---

[7] The SSA considers an impairment not severe if "it does not significantly limit [a claimant's] ability to do basic work activities," such as walking, standing, seeing, hearing, speaking, remembering, using judgment, and responding appropriately to the work environment. 20 C.F.R. §§ 404.1520(c), 404.1522. In contrast, a severe impairment must significantly limit a claimant's ability to do these activities, and the impairment must last a minimum of 12 months. 20 C.F.R. §§ 404.1509, 404.1522.

"severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). To be considered disabled at step three because she meets a listing, Plaintiff's impairment must meet every element of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). To establish disability "by showing that [an] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Id.* at 531. Plaintiff's impairment would also have to have lasted or be expected to last for a continuous period of 12 months or to result in death. 20 C.F.R. § 404.1509. The ALJ found that neither of Plaintiff's severe impairments, along or in combination, met or medically equaled the severity of a listed impairment. (R. 25.)

As the last task before leaving step three for step four, the ALJ crafted an RFC for Plaintiff.[8] The ALJ found that Plaintiff could "perform light work as defined in 20 C.F.R. 404.1567(b) except occasional climbing, balancing, stooping, kneeling, crouching, and crawling." (R. 21.) Had Dr. Gilchrist's opinions been persuasive in the ALJ's eyes, those opinions would have imposed restrictions on Plaintiff, particularly a limit of three hours of standing in an eight-hour workday, that would have limited Plaintiff, according to the hearing testimony of the vocational expert, to sedentary, rather than light, work. (R. 60.)

---

[8] RFC is the most a person can do despite any functional limitations and restrictions resulting from a medically determinable impairment or combination of impairments. SSR 96-8p, 61 Fed. Reg. 34474 (Jul. 2, 1996). It is the most a person can do despite their limitations.

10

Since the work of a pharmacy technician is classified as light work, acceptance of Dr. Gilchrist's opinions as persuasive would have meant Plaintiff could not have been found capable of performing her past relevant work as a pharmacy technician.

Because the ALJ found an RFC that allowed, with some modifications, light work, the ALJ, at step four, found that Plaintiff could perform her past relevant work as a pharmacy technician. The ALJ therefore terminated the five-step process at step four and concluded that Plaintiff was not disabled under the standards of the Social Security Act. (R. 33.)

## II. STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited. The district court "reverses the findings of the Commissioner only if they are unsupported by substantial evidence or result from an error of law." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the

11

Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden of proving disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB, the claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

**III.   ANALYSIS**

**A.   Dr. Gilchrist's Opinions Were Not Consistent with His Own Clinical Findings, Nor Were They Supported by Other Medical Evidence in the Record.**

The social security regulations identify supportability and consistency as the two most important factors an ALJ should consider when evaluating the persuasiveness of a medical opinion. "The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions of prior administrative medical findings to be." 20 C.F.R. § 404.1520c(b)(2)(c). Supportability is defined by the regulations as "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be,"

12

20 C.F.R. § 404.1520c(c)(1). Consistency is defined as "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be," 20 C.F.R. § 404.1520c(c)(2). While supportability looks to how well the medical source justifies their own opinion, consistency looks to how well the medical source's opinion fits with evidence from other medical sources.

Plaintiff asserts that the ALJ did not adequately address the supportability and consistency requirements of 20 C.F.R. § 404.1520c when evaluating Dr. Gilchrist's opinions. (Pl.'s Mem. at 13.) The Court disagrees. The ALJ pointed to a lack of support for Dr. Gilchrist's opinions in the record, and also to Dr. Gilchrist's opinions being at odds with other medical evidence and Plaintiff's own self-reports of her activities.

Plaintiff claimed disability beginning on April 12, 2019, when she lost her job as a pharmacy technician, but she then went back to work, from September of 2019 through January of 2020, in a job that required her to be on her feet for several hours a day, to crawl, to pick up toddlers to put them on the changing table or comfort them, and to sit down at their little tables at mealtimes. (R. 45–46.) The ALJ's statement that "there was no evidence of the claimant seeking out medical attention for her bilateral knees prior to January 30, 2020" (R. 26) may be an overstatement, but if so it is harmless. The ALJ cites medical records from Dr. Gilchrist's clinic as support for the statement, but Plaintiff's return to work after her alleged disability onset date means the ALJ evaluated disability from the date Plaintiff lost her daycare job (January 31, 2020) not from her alleged disability onset

13

date (April 12, 2019). This, in turn, means medical records between April 12, 2019 and January 30, 2020 were omitted from the administrative record. In addition, there are references within the medical records that are in the record to Plaintiff having knee issues going back to 1985, when Plaintiff tore her left anterior cruciate ligament, and to 2015, when Plaintiff had arthroscopic knee surgery. Even correcting for the ALJ's potential overstatement, however, the ALJ did not err in finding that Plaintiff's claim that, as of April of 2019, she was disabled due to osteoarthritis of the knees was not consistent with working from September 2019 through January 2020 at a job that was as hard on one's knees as the daycare job was. As the ALJ correctly found, Plaintiff "clearly had been capable of standing and/or walking for more than 3 hours per 8-hour day." (R. 32.) The ALJ also legitimately wondered why, if Plaintiff had been capable of functioning in her daycare job up until the end of January 2020, she claimed to be disabled due to arthritis in her knees on January 30, 2020 when she saw Dr. Grimm. (*Id.*) As the ALJ observed, there is nothing in the administrative record that explains such a rapid decline. (*Id.*)

Plaintiff correctly observes that the ALJ's discussion of Dr. Gilchrist's opinion evidence is brief. In and of itself, that does not mean the discussion is inadequate. In the section of the ALJ's order that is specifically devoted to his analysis of the persuasiveness of Dr. Gilchrist's opinions the ALJ points out the disjunct between Plaintiff's daycare work, a job she performed after her alleged disability onset date, plus observing that nowhere in the record can one find an explanation for the alleged sudden decline in the condition of Plaintiff's knees.

14

With respect to the consistency factor of 20 C.F.R. § 404.1520c, an ALJ may consider evidence in the record that reflects inconsistencies with a medical source statement. *Tracey L.W. v. Kijakazi*, No. 21-CV-2441 (TNL), 2023 WL 2600217 *8 (D. Minn. 2023). The Court has considered such evidence only to the extent it maps onto Dr. Gilchrist's opinion about Plaintiff's restrictions. The record evidence relevant to the consistency of Dr. Gilchrist's opinions includes the ALJ's acknowledgment of Dr. Tanner's finding of only moderate osteoarthritis in both knees (R. 29, 591, 617) and the improvement Plaintiff experienced following steroid injections (R. 28, 659).

As to supportability, the ALJ found that Dr. Gilchrist's opinions were not supported by his treatment notes. The ALJ's finding is supported by substantial evidence. (*E.g.*, R. 594 (noting an improvement in knee pain, due to injections); R. 633–34 (on physical examination, noting no visible effusion in the knees, no pain to palpation, and temporary pain relief from injections); R. 659–60 (noting marked improvement in left knee pain; intact range of motion in the right knee, with no pain). Furthermore, Dr. Gilchrist's statement that his opinions are supported, in part, by "extensive" physical therapy is impossible to reconcile with the fact that Plaintiff went to physical therapy only twice in 14 months, once on the last day of January 2020 and once more in February 2020, even though she and the physical therapist had planned on 5 to 15 visits.

Another reason the ALJ gave for finding Dr. Gilchrist's opinions not persuasive was that Dr. Gilchrist based the three-hour standing and walking limitation on Plaintiff's subjective complaints. (R. 28.) An ALJ may reduce the persuasive value of an opinion that is based largely on a claimant's subjective complaints. *Austin v. Kijakazi*, 52 F.4th 723,

15

729 (8th Cir. 2022); *see Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (under former regulations, giving "less weight" to an opinion based mostly on subjective complaints). Elsewhere in his decision, the ALJ analyzed the inconsistencies between Plaintiff's subjective statements about her condition and the medical evidence, her daily activities and routine, and her work history to find that her symptoms were not as intense, persistent, or limiting as she claimed.

### B. The ALJ Adequately Factored Plaintiff's Obesity Into the RFC.

Plaintiff claims that the ALJ did not adequately consider the compounding effect of Plaintiff's obesity on her bilateral knee osteoarthritis. Social Security Ruling 19-2p explains that "[p]eople with obesity have a higher risk for other impairments, and the effects of obesity combined with other impairments can be greater than the effects of each of the impairments considered separately."

Plaintiff asserts that "there is no indication in the decision that the ALJ properly considered the combined effects of Plaintiff's obesity and degenerative joint disease. . . ." This is simply not correct. In the discussion of Plaintiff's RFC, the ALJ devoted a full paragraph to a description of Plaintiff's obesity as measured by BMI. The ALJ then recited the medical steps that had been taken—dietary recommendations from dietitians and two different medications—to try and manage Plaintiff's weight.

It is also worth noting that the medical records do not indicate that Plaintiff's weight aggravated her arthritis. The orthopedic surgeons classified Plaintiff as an unacceptably risky surgical candidate due to her obesity, and Dr. Gilchrist, as Plaintiff's primary care physician, acted upon the reservations the surgeons expressed by working with Plaintiff on

weight loss. The goal, though, was always expressed as making knee replacement surgery safe for Plaintiff, not limiting any aggravating effect Plaintiff's obesity had on her osteoarthritis. SSR 19-2p states that obesity "may" aggravate arthritis, not that it will always aggravate arthritis. The physicians in this case did not indicate that Plaintiff's obesity made her arthritis worse, and the ALJ adequately considered Plaintiff's obesity in assessing her RFC.

Accordingly, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Plaintiff's Motion for Summary Judgment (Dkt. No. 16) is **DENIED**; and

2. Defendant's Motion for Summary Judgment (Dkt. No. 20) is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  March 25, 2024                        *s/  John F. Docherty*
                                             JOHN F. DOCHERTY
                                             United States Magistrate Judge